# United States Court of Appeals
## For the First Circuit

No. 24-1750

UNITED STATES OF AMERICA,

Appellee,

v.

CRAIG MEDOFF,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Montecalvo, Howard, and Aframe,
Circuit Judges.

Amy Barsky, with whom Fick & Marx LLP was on brief, for appellant.

Donald C. Lockhart, Assistant United States Attorney, with whom Leah B. Foley, United States Attorney, was on brief, for appellee.

November 18, 2025

**AFRAME, Circuit Judge.** In 2016, following approximately four years of litigation in a civil securities fraud enforcement action brought by the Securities and Exchange Commission ("SEC"), defendant-appellant Craig Medoff agreed to the entry of a judgment that, for ten years, barred him and any entity he owned or controlled "from participating in the issuance, offer, or sale of any security."

In 2024, Medoff pleaded guilty to criminal contempt of this judgment, see 18 U.S.C. § 401(3); Fed. R. Crim. P. 42(a), and was sentenced to twenty months of imprisonment, a variance of ten months above the top of the applicable guidelines sentencing range ("GSR"). He now seeks vacatur of his sentence on two grounds. He principally argues that the sentencing judge should have recused himself from presiding over the criminal contempt proceeding because his impartiality might reasonably have been questioned. See 28 U.S.C. § 455(a). Alternatively, he contends that his sentence was procedurally and substantively unreasonable. We reject his arguments and affirm.

## I.

Medoff has a long history of violating federal securities laws and being involved in related criminal and civil proceedings. We provide a detailed account of this history to place Medoff's recusal arguments in context. The following facts are undisputed.

**A.**

On September 7, 1993, Medoff settled an SEC civil enforcement action, brought in the Southern District of New York, that charged him and the company of which he was president with fraudulently offering unregistered securities. In settling the case, Medoff consented to the entry of a permanent injunction that barred him from violating the anti-fraud provisions of the federal securities laws; required him to pay a civil penalty of $95,500; and ordered him to disgorge money he had obtained through his fraudulent conduct. On January 6, 1995, in a related administrative action, Medoff also agreed to an offer of settlement that barred him from associating with any securities broker, dealer, investment advisor, investment company, or municipal securities dealer. Medoff neither paid the civil fine nor complied with the disgorgement order. Nor, as we shall see, did he abide by the terms of the prohibitory orders that regulated his conduct with respect to securities.

On April 26, 1995, in a criminal action that was also instituted in the Southern District of New York, Medoff pleaded guilty to a sealed information charging him with two counts of conspiracy to commit fraud in connection with the offer and sale of securities. On October 20, 2009, more than fourteen years after his guilty plea, Medoff was sentenced to three years of probation and a $6,000 fine, which he did not fully pay. From 2011 to 2014,

Medoff was twice incarcerated for a total of about seventeen months on probation violations for failing drug tests and not making payments towards the fine.

**B.**

On December 14, 2012, while Medoff's troubles in the Southern District of New York were ongoing, the SEC instituted a civil enforcement action in the District of Massachusetts against Medoff; Biochemics, Inc. ("Biochemics"); and two additional individuals. The complaint alleged, among other things, that Medoff had participated in a fraudulent scheme to sell Biochemics securities to investors. It also highlighted the 1993 and 1995 judicial and regulatory orders that barred Medoff from violating the antifraud provisions of the federal securities laws and associating with any securities broker, dealer, investment advisor, investment company, or municipal securities dealer. The case was assigned to then-Chief Judge Wolf.

On March 18, 2015, the SEC submitted a proposed consent judgment for defendant Biochemics to the district court. The judgment contained language stating that the company would have to pay a substantial fine and disgorgement order within fourteen days of its entry. The court rejected this proposed judgment, apparently because all parties agreed that Biochemics would be unable to pay the disgorgement order and fine within the short

- 4 -

time specified. The court stated that it would not issue an order that it did not intend to enforce.

A few days later, on March 25, 2015, the district court entered a revised judgment for defendant Biochemics that obligated the company to disgorge $17,147,884 (including prejudgment interest) and to pay a civil penalty of $750,000. The revised judgment contained a schedule requiring payment of the fine within seven months and thereafter requiring payment of the disgorgement order, with interest, in five consecutive monthly payments. Biochemics paid the fine but did not make any of the disgorgement payments. During the litigation that ensued, the court repeatedly reiterated its unwillingness to issue orders that it did not intend to enforce.

On May 25, 2016, the district court entered a final consent judgment against Medoff that, for a period of ten years, prohibited him and any entity that he owned or controlled "from participating in the issuance, offer, or sale of any security." The judgment also ordered Medoff to pay a $100,000 civil penalty and to disgorge $14,370.20 (including prejudgment interest). As in the Southern District of New York litigation, Medoff did not satisfy any of these obligations.

On September 27, 2023, the SEC sought an order for Medoff to show cause why he should not be held in civil contempt for failing to comply with the 2016 consent judgment. In a memorandum

- 5 -

supporting its motion, the SEC stated that, in violation of the 2016 consent judgment, since at least 2021, Medoff "had involvement with, and likely ownership and/or control of, a financial services company . . . [named] Nova Capital International LLC" ("Nova Capital").  The SEC attached to its memorandum affidavits and exhibits supporting its allegations about Medoff's involvement with Nova Capital and detailing Medoff's history of securities fraud and non-compliance with court orders.  It requested, among other things, an order directing Medoff to cease violating the 2016 consent judgment and to disgorge all money earned through its violation.  It also requested "[a]n order imposing such other sanctions as the Court deems appropriate, including additional civil penalties, to ensure Medoff's future compliance."

On October 13, 2023, the district court issued a responsive memorandum and order stating that the SEC had provided "ample evidence to justify the initiation" of civil contempt proceedings.  The court also stated that the SEC's evidence "raises the question of whether it would be appropriate for the court to initiate criminal contempt proceedings instead."  The court elaborated:  "In view of Medoff's proven history of violating court orders, conducting proceedings that could only result in another order that could be violated might be futile.  Therefore, [a] civil remedy may be inappropriate and criminal contempt proceedings may be justified."

- 6 -

In the memorandum, the district court also scheduled a hearing for October 23, 2023, "to address whether [it] should initiate civil or criminal contempt [proceedings] for the violations of its May 25, 2016, [consent judgment] alleged by the SEC . . . ." And it further ordered that a representative from the U.S. Attorney's Office attend the hearing, as well as any counsel Medoff retained to handle a possible criminal prosecution. The court also stated that, if Medoff wished to have counsel appointed from the Criminal Justice Act ("CJA") panel, he should file an appropriate financial affidavit with the court in time for appointed counsel to attend the hearing.

Medoff did not request the appointment of counsel -- he instead attempted to secure private counsel -- but counsel from the CJA panel nonetheless attended the hearing as an observer. So, too, did an assistant U.S. attorney. At the hearing, the district court reiterated its concern that issuing another civil contempt order would be futile. Speaking to counsel for the SEC, the court explained why it was considering criminal contempt:

> I don't issue orders that I don't expect are going to be obeyed and my concern is . . . that if I just order [Medoff] not to . . . engage in the securities business, I don't know why I would have any confidence he's going to obey the order the third time when he, according to you, didn't obey the 2016 order at all. And if he's in the securities business, he's continuing to present a danger.

Counsel for the SEC responded that the SEC only has the authority to move for civil contempt, not criminal contempt; that the agency shared the court's futility concerns; but that, in its view, a targeted civil contempt order could nonetheless be effective. Counsel added: "If I'm wrong, then the recourse to criminal contempt remains."

At the end of the hearing, the district court agreed to give Medoff additional time to secure funds to hire private counsel. The court also deferred deciding whether to institute a criminal contempt proceeding while the parties explored a possible resolution of the SEC's motion to show cause. But the court made clear that it was then inclined towards initiating criminal contempt proceedings. The court also advised Medoff of his right to remain silent, and that, if a criminal case were initiated against him, he might be entitled to a jury trial; appointed counsel; and pretrial release, if there were a combination of conditions that would protect the community from any danger he posed. Two days later, on October 25, 2023, two privately retained lawyers appeared for Medoff.

On November 17, 2023, the parties filed a joint status report notifying the district court that they had reached an agreement to resolve the SEC's motion to show cause. The agreement, which outlined several civil sanctions to be imposed on Medoff, was subject to his providing the SEC with certain

information and documentation. The joint status report also stated: "[I]n light of Medoff's agreement to comply and supporting documentation [sic], the SEC does not recommend sanctions beyond those outlined above to ensure future compliance." By order dated November 22, 2023, the court directed the parties to file a jointly proposed order implementing their agreement and including "a provision stating that [the agreement] is without prejudice to the court's authority to initiate criminal contempt proceedings for any possible violation of prior orders and/or the proposed order." Six days later, the parties filed the proposed order.

On December 1, 2023, the district court held a hearing on the proposed order, which contained the required language regarding criminal contempt and also, among other things, obligated Medoff to cease engaging in conduct violative of the 2016 consent judgment; to provide the SEC with certain information about Nova Capital's clients; to provide Nova Capital clients with curative notice of his "disciplinary history"; and to provide detailed accountings of his and Nova Capital's assets and liabilities. At the hearing, the court asked counsel for the SEC what it meant by its statement in the November 16, 2023, status report that it did not recommend sanctions beyond those outlined in the report. SEC counsel replied:

> I think there may have been some confusion
> there, and I apologize if that was unclear to
> the Court. What we were referring to there

is with respect to civil contempt. So part of our original motion contemplated that there may be penalties or other sanctions entered by your Honor to enforce the 2016 judgment. This is just speaking to any further civil contempt.

At the close of the hearing, the court stated that it would issue the proposed order and again deferred deciding whether to institute criminal contempt proceedings until after Medoff produced the remaining discovery contemplated by the order.

On February 5, 2024, after discovery closed, the SEC filed a status report summarizing what it had learned from Medoff's production of information and documents. The SEC reported, among other things, that Medoff had produced all the information that he was required to produce by the December 1, 2023, order; that Medoff was in the process of producing additional documents sought by the SEC based on what it learned in discovery; that Medoff had, since 2016, controlled Nova Capital and, through it, had engaged in the offer and sale of securities in violation of the 2016 consent judgment; that Medoff had used the alias "Alexander Carlin" in connection with his Nova Capital work; that Nova Capital had received approximately $1.8 million in fees in violation of the 2016 consent judgment; that Medoff's personal net benefit from the $1.8 million in fees was worth approximately $1.675 million; that the SEC subsequently would be moving for a final order of civil contempt; and that the SEC would be seeking, among other things,

that Medoff disgorge the money that he obtained from violating the 2016 consent judgment.

On February 6, 2024, the district court responded with an order stating that the SEC's February 5, 2024, status report "suggests that promptly initiating criminal contempt proceedings for [Medoff's alleged violations of the 2016 consent judgment] may be most appropriate for several reasons, including but not limited to the risk that an order of disgorgement if Medoff is held in civil contempt may be futile." Therefore, the court directed the SEC to file a memorandum and affidavit addressing whether Medoff had the ability to pay $1.675 million, or any other substantial sum, if ordered to do so. The court also invited, but did not require, Medoff to do the same.

The next day, the SEC filed the required memorandum and affidavit. These documents represented that Medoff had received approximately $200,000 annually for work he performed through Nova Capital from June 2016 through November 2023; that Medoff had spent or distributed all that money and had a negative net worth; that Medoff was the beneficiary of a family trust with approximately $920,000 in liquid assets; that the trust presently paid Medoff approximately $2,200 per month; that the SEC did not include the trust assets in assessing Medoff's net worth because Medoff did not possess or exercise control of those assets; and that Medoff had informed the SEC that he had a possible opportunity for future

non-securities-related income that he could use to pay down a monetary penalty.

The day after the SEC's filing, Medoff filed his own affidavit, which stated that he was "deeply apologetic to the Court [for failing] to comply with the 2016 [consent judgment]." The affidavit also stated that Medoff had paid $10,000 toward the disgorgement and civil penalties owed from that judgment; that he did not have a "current ability to pay a substantial disgorgement or civil penalty" but was "in the process of arranging three separate revenue streams that, if successful, [would] enable [him] to pay the disgorgement penalties over time"; and that, going forward, he was willing to pay the SEC twenty percent of his quarterly income from the trust and other sources.

On February 9, 2024, the district court convened another hearing on whether it should institute criminal contempt proceedings against Medoff. At that hearing, counsel for the SEC confirmed its earlier representation that the SEC does not have the authority to seek criminal contempt. In doing so, SEC counsel acknowledged that, on a couple of occasions, the SEC had "weighed in" with a U.S. attorney's office about that office initiating a criminal contempt proceeding but had been told that the office could not act without a court order. SEC counsel also represented that the SEC believed that Medoff had a negative net worth of approximately $200,000; that he lacked any assets to pay the fine

imposed in the 2016 consent judgment or any order of disgorgement; but that he was no longer engaging in conduct prohibited by the 2016 consent judgment.

Medoff's counsel opposed the initiation of criminal contempt proceedings by emphasizing that Medoff had been cooperative with the SEC over the preceding several months. Medoff's counsel also reiterated statements in his client's affidavit that Medoff would apportion twenty percent of his personal income to pay down his debt and that Medoff had some potential income streams that he could earn consonant with the 2016 consent judgment. Medoff's counsel concluded by stating: "I think we've demonstrated Mr. Medoff's intent to cooperate and . . . just ask . . . for a little bit more time to prove it."

The district court next heard from Medoff himself, who attributed his violation of the 2016 consent judgment to "confusion" because he was an "active drug addict" when the judgment was entered. The court asked Medoff when he had stopped using drugs, and Medoff responded "[t]hree years ago, Your Honor." The court followed up by asking whether, during the three years since he stopped using drugs, Medoff had continued to work on behalf of Nova Capital using an alias. Medoff confirmed that he had. The court then announced its intention to issue a written order requiring Medoff to show cause why he should not be held in criminal contempt. No party objected to the court initiating

criminal contempt proceedings without referral to the U.S. Attorney's Office for evaluation and, if appropriate, a grand jury indictment.

On February 12, 2024, the district court issued the contemplated order. The order invoked section 401(3) of title 18, which, in pertinent part, empowers a court to punish contempt of its authority through "[d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." The order also invoked Federal Rule of Criminal Procedure ("Rule") 42(a)(1), which provides that a person prosecuted for criminal contempt shall receive notice from the court of the time and place of trial, reasonable time to prepare a defense, a statement of the essential facts constituting the charged criminal contempt, and a description of it as such. The order charged Medoff with "knowingly and willfully violating . . . the 2016 [consent judgment] by engaging in the alleged offer and sale of securities by his conduct related to Nova Capital International LLC."

Pursuant to Rule 42(a)(2), the district court appointed the U.S. Attorney for the District of Massachusetts to prosecute the case.[1] The court also set the trial for April 1, 2024, and,

---

[1] By its terms, Rule 42(a)(2) obligates the court to "request" that the criminal contempt proceeding be prosecuted by an attorney for the government and contemplates a discretionary decision by the government whether to accept the request. But no party objected to the court's appointment of the government without

pursuant to Rule 42(a)(3), released Medoff pending a hearing on whether he should be detained pending trial. Because the court determined that incarceration for a period of more than six months might be necessary to serve the purposes of sentencing, it ruled that Medoff was entitled to a jury trial. See Codispoti v. Pennsylvania, 418 U.S. 506, 512, 516-17 (1974) (indicating that the jury-trial right attaches to a criminal contempt charge potentially resulting in a sentence of more than six months in prison); Rule 42(a)(3) ("A person being prosecuted for criminal contempt is entitled to a jury trial in any case in which federal law so provides"). And because the alleged contempt did not involve disrespect toward or criticism of the court personally, the court stated that it would preside in the contempt proceeding. See Rule 42(a)(3) ("If the criminal contempt involves disrespect toward or criticism of a judge, that judge is disqualified from presiding at the contempt trial or hearing unless the defendant consents.").

In its order, the district court further elaborated on why it had chosen to initiate a criminal contempt proceeding. The court started by observing that civil and criminal contempt proceedings serve different purposes. See United States v.

---

such a request or, as we shall describe, to the government's tacit acceptance of the appointment by timely entering an appearance and subsequently prosecuting the case.

Marquado, 149 F.3d 36, 39 (1st Cir. 1998).  It explained that sanctions for civil contempt are meant to coerce compliance with court orders, while sanctions for criminal contempt are meant to punish violations of, and to deter future violations, of such orders.  See id. at 39-40; Yates v. United States, 355 U.S. 66, 75 (1957).  After acknowledging that a court should resort to criminal sanctions only after determining, for good reason, that civil sanctions would be insufficient, the court identified two reasons for charging Medoff with criminal contempt.  See Shillitani v. United States, 384 U.S. 364, 371 n.9 (1966).

First, the district court stated that "holding Medoff in civil contempt would be futile" because Medoff lacked the means to pay an appropriate penalty or disgorgement order, and because Medoff's history of flouting court orders even after serving jail time suggested that fear of prison would not deter him from disobeying a civil contempt order.[2]  Second, the court stated:

> [T]here is far more than probable cause to
> believe that Medoff knowingly, willfully, and
> repeatedly disobeyed the 2016 [consent
> judgment].  There is, therefore, reason to be
> concerned that Medoff may continue to present
> a danger of committing crimes and that his
> incarceration may be necessary to protect the
> public.  In any event, it is important to the

_____

[2] Despite its concerns about futility, the court authorized the SEC to continue exploring the possibility of disgorgement and other civil sanctions pursuant to its motion to show cause in the civil action.  But the court also stated that it "intend[ed] to resolve the criminal charge before conducting civil contempt proceedings."  The civil action remains ongoing.

- 16 -

administration of justice to demonstrate that court orders cannot be violated with impunity. If proven, or admitted, a criminal sanction for contempt will be justified to punish Medoff, to protect the public, and to deter him and others from engaging in comparable conduct in the future. See Yates, 355 U.S. at 74.

## C.

We now reach the criminal contempt proceedings that give rise to this appeal. The case began with a flurry of pretrial activity. On February 12, 2024, the district court issued a pretrial order reiterating that trial would commence on April 1, 2024; directing the parties to confer and report by February 20, 2024, whether they had either reached an agreement to resolve the case or would like a continuance until February 27, 2024, to attempt to do so; and setting deadlines for various pretrial disclosures.

On February 21, 2024, the district court issued an order permitting Medoff's counsel in the 2016 civil enforcement action to withdraw, granting Medoff's request for the appointment of CJA counsel (which was supported by the required financial affidavit), and appointing Attorney Peter Horstmann to serve as CJA counsel. On February 22, 2024, Assistant U.S. Attorney {"AUSA") Leslie Wright appeared for the government. Again, as we have mentioned, at no point did the government indicate an unwillingness to accept the court's appointment to prosecute the case. Cf. Fed R. Crim.

- 17 -

P. 42(a)(2) ("The court must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney. If the government declines the request, the court must appoint another attorney to prosecute the contempt.").

Five days after his appointment, Attorney Horstmann filed an assented-to motion to extend the relevant deadlines and continue the trial. The motion stated that Attorney Horstmann needed more time to prepare and had other trials scheduled to begin on April 1, 2024, and June 17, 2024. The motion also stated that AUSA Wright had a trial scheduled to start on July 15, 2024. The motion requested that trial be continued to an unspecified, mutually convenient date. The next day, on February 27, 2024, the parties filed a joint status report requesting additional time to confer about potentially resolving the case.

On February 28, 2024, a magistrate judge ordered Medoff released on conditions pending trial. The conditions did not include drug testing or drug treatment. The day following Medoff's release, the district court issued an order granting the assented-to motion to extend deadlines and continue the trial; it also extended until March 12, 2024, the parties' deadline to report whether they had reached an agreement to resolve the case. This order did not set a new trial date.

On March 12, 2024, the parties filed a joint status report stating that they did not anticipate resolving the case and that a trial would last one or two days. The report also stated that Medoff would file discovery motions and might request the district court to recuse itself and to dismiss the criminal contempt proceeding based on collateral and/or judicial estoppel.

On March 14, 2024, the district court filed a responsive order asking Attorney Horstmann to report whether he still expected his trial scheduled for April 1, 2024, to begin on that date. The order further directed Medoff to file any recusal motion by March 20, 2024. It also ordered Medoff to include with any such motion a memorandum addressing (1) why disqualification was warranted considering that the alleged criminal contempt did not involve disrespect or criticism of the court, see Fed. R. Crim. P. 42(a)(3); and (2) if the motion to recuse were to be based in whole or in part on section 455(a) of title 28, which requires the court to recuse where the court's "impartiality might reasonably be questioned," to discuss the legal standards for applying the statute. Finally, the order stated that trial would begin on April 22, 2024, if the court were to deny any motion to recuse.

On March 20, 2024, Medoff filed two motions: a motion to recuse under section 455(a) and an assented-to motion to continue the trial date from April 22, 2024, to an unspecified, mutually convenient date. The recusal motion argued that the following

rulings and conduct gave rise to an appearance of bias that would cause a reasonable observer to question the district court's impartiality: (1) the court had shown a "fixation" with initiating criminal contempt proceedings by repeatedly mentioning its likelihood of doing so in the months following the filing of the SEC's motion to show cause; (2) the court had raised the possibility of charging Medoff with criminal contempt without the SEC requesting that it do so; (3) the court had rushed the proceedings by initially scheduling a trial date for just more than six weeks after their initiation; (4) the court had expressed an unfounded concern, based on Medoff's prior conduct, that he constituted a "danger" to the community and was a candidate for pretrial detention; and (5) the court had sandbagged Medoff by initiating the criminal case after leading Medoff to believe that he could avoid criminal liability by cooperating with the SEC to resolve the motion to show cause.[3]

---

[3] Medoff later raised this sandbagging argument in an April 18, 2024, motion captioned "Motion in Limine to Dismiss Criminal Case or to Suppress Involuntary Statements Induced by Promissory Estoppel." In an April 23, 2024, memorandum and order, the district court denied the motion, noting that, in affording Medoff the opportunity to resolve the SEC's motion to show cause, the court had repeatedly advised him that it was doing so "without prejudice to its right to institute criminal contempt proceedings." Medoff does not challenge this ruling or otherwise raise sandbagging as a concern on appeal. Therefore, we will say nothing more on the issue.

On March 25, 2024, the district court entered a memorandum and order denying the assented-to motion to continue the trial. The order stated: "Both the motion for a lengthy continuance of the trial date and Medoff's motion to recuse suggest that [Medoff's] counsel . . . may not understand the elements of criminal contempt." The order directed the parties' counsel to file by March 28, 2024, affidavits stating whether they had reviewed all the pleadings, hearing and deposition transcripts, and documents produced to the SEC since the filing of the SEC's motion to show cause. By way of explanation, the court stated: "The information is necessary for the court to make a properly informed decision on whether any further continuance of the trial date is justified." The parties' counsel timely complied.

Meanwhile, on March 26, 2024, the government filed a response to Medoff's recusal motion under section 455(a). The response stated:

> [I]n an abundance of caution -- and because the Court has itself referred this matter to the government for prosecution -- the government defers to the Court as to whether, in the unique circumstances in which a court has sua sponte initiated criminal contempt proceedings, the various defense contentions in this case meet the "high threshold . . . required to satisfy" the [section] 455(a) recusal standard . . . based on the need to avoid the "objective appearance" of partiality.

(ellipses in original) (quoting <u>Liteky</u> v. <u>United States</u>, 510 U.S. 540, 558 (1994) (Kennedy, J., concurring)). On appeal, the government remains neutral on the recusal question and accordingly has declined to respond to Medoff's argument in this Court.

On April 9, 2024, the district court convened a hearing on Medoff's motion to recuse. At the outset, the court expressed displeasure that the U.S. Attorney's Office had taken no position on the motion and doubt that it intended to properly prosecute the criminal contempt case. After hearing from Medoff's counsel, the court denied the motion. In doing so, the court reiterated its reasons for initiating a criminal contempt action, recited the applicable legal standards, and rejected the specific arguments made in Medoff's motion. The court emphasized that, in its view, there was no basis for a reasonable person to question its impartiality.

In particular, the district court stated (1) that what Medoff described as its "fixation" on the likelihood of a criminal contempt proceeding was better understood as its effort to protect Medoff's rights and to allow him to make informed decisions about whether and how to cooperate in the civil case; (2) that the SEC's failure to recommend criminal contempt was meaningless because, as the agency explained, it lacked the authority to do so; (3) that the initially contemplated April 1, 2024, trial date was appropriate given the uncontested facts, the months of warnings

that the court had given about the likelihood of criminal contempt proceedings, and then-counsel's knowledge of the case;[4] and (4) that the statement regarding Medoff's possible pretrial detention was nothing more than a statement of what the law requires when a court initiates a criminal contempt proceeding, see 18 U.S.C. § 3142; Fed. R. Crim. P. 42(a)(3), 46.

The district court concluded the hearing by stating that Medoff's motion to recuse "appears . . . frivolous" and "to be an effort to . . . further delay the trial."  The court added:  "It is, in my view . . . an effort to manipulate the system for strategic purposes, perhaps to obtain another judge who would have to do a great deal of work to prepare and, as I say . . . to further delay this matter."  Medoff's counsel responded:  "I would just like to say that there's no judge shopping going on here. There's absolutely none. . . .  I'm not shopping for a better judge."  The court replied:  "Okay, maybe for delay . . . ."  To which Medoff's counsel responded:  "Maybe.  Maybe righteous delay." The court then delayed the trial date for another week, to April 29, 2024.[5]

---

[4]    On February 12, 2024, the date on which the district court set April 1, 2024, as the trial date, counsel in the civil action had not yet withdrawn.  As noted above, Attorney Horstmann was not appointed CJA counsel until February 21, 2024.

[5]    On April 23, 2024, Medoff filed a notice of appeal of the district court's April 9, 2024, order denying his motion to recuse.  Perhaps recognizing that this interlocutory order was not

- 23 -

On April 16, 2024, Medoff filed an assented-to "emergency" motion for a hearing on a proposed Rule 11(c)(1)(C) plea agreement. The motion sought an expedited hearing because of the impending trial date and filing deadlines. This binding plea agreement, if accepted, would have required the district court to sentence Medoff to zero to three months in prison followed by twelve months of supervised release.

The following day, the district court issued a written memorandum and order denying the motion and rejecting the plea agreement. The court explained that, based on its understanding of Medoff's criminal history, a zero-to-three-month sentence would involve a downward variance, as the applicable GSR called for a sentence of four to ten months. But, in the court's view, there were likely no justifiable reasons for such a downward variance. See U.S.S.G. § 6B1.2(c)(2) (stating that a court may accept a Rule 11(c)(1)(C) plea requiring a sentence outside the applicable guideline sentencing range only if "(A) the agreed sentence is outside the applicable guideline range for justifiable reasons; and (B) those reasons are set forth with specificity in the statement of reasons form"). In reaching this conclusion, the

subject to immediate appeal, see 28 U.S.C. § 1292, Medoff subsequently withdrew the notice, and, on May 8, 2024, filed a petition for a writ of mandamus in this Court. The petition sought, inter alia, the district court's recusal. About a week later, we denied Medoff's petition.

court noted that, given its prior ruling that Medoff had a jury-trial right because a six-month sentence might not be sufficient to serve the interests of sentencing, the parties should have foreseen that the court would reject a plea agreement requiring the imposition of a sentence of not more than three months. And the court also opined that, considering the case's travel, the proposed plea agreement may have been submitted for purposes of delay.

On April 23, 2024, citing medical reasons, the district court rescheduled a pretrial conference (previously scheduled for April 26, 2024) to April 29, 2024, and rescheduled the trial to May 20, 2024. On April 26, 2024, the court issued a memorandum and order directing that Medoff attend the pretrial conference and that the parties be prepared to address whether Medoff's conditions of release should be amended to include drug testing and, if appropriate, drug treatment. The court explained that it was raising the issue because Medoff's appearance and conduct at the April 9, 2024, hearing on the recusal motion had caused it concern that Medoff once again was using illegal drugs.

Meanwhile, also on April 26, 2024, the parties filed a joint motion for leave to file a motion for a hearing on a second proposed Rule 11(c)(1)(C) plea agreement. This time the proposed plea agreement would have bound the court to impose a sentence in the four-to-ten months range, followed by thirty-six months of

supervised release, and carried with it a government recommendation for a four-month sentence.

At the April 29, 2024, pretrial conference, the district court denied the motion for a hearing on the second proposed plea agreement and rejected the agreement. In doing so, the court questioned whether the voluminous filings that the government was forced to prepare and submit in getting ready for trial following the rejection of the first proposed plea agreement should lead Medoff to lose the two-level downward adjustment for acceptance of responsibility that the parties had agreed to in predicting the applicable GSR. See U.S.S.G. § 3E1.1, cmt. n.1(H) (stating that "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility" should be accounted for in evaluating whether to give a downward adjustment). If Medoff were not given this adjustment, his GSR would be eight to fourteen months, and the government's recommended sentence of four months would involve a downward variance for which there might not be justifiable reasons. The court also expressed concern that Medoff's criminal history -- which included unscored criminal history -- might under-represent the risk that he would engage in future criminal conduct. If this were so, the court indicated, it might be inclined to give an above-guidelines sentence.

At the April 29, 2024, pretrial conference, the district court also addressed Medoff's release conditions. The court

explained that it had become concerned that Medoff might be using drugs again because, at the April 9, 2024, hearing, Medoff had placed his head on the table for a long period of time, knocked over a glass of water, and was then permitted to leave the courthouse, at counsel's request, before the hearing concluded.

Medoff's counsel advised the district court that Medoff was ill at the April 9, 2024, hearing and argued against imposing additional release conditions. At one point during his counsel's argument, and against the advice of counsel (who repeatedly urged Medoff to remain silent), Medoff interrupted to advise the court that he is "a documented freebase cocaine addict"; that his drug of choice "is freebase cocaine, not heroin, not opiates, not anything that would make [him] sleepy"; that he had a severe chest cold at the earlier hearing; and that if he had been using cocaine, he would have been frenetic and not lethargic.

After hearing argument and Medoff's comments, the district court ordered that drug testing and, if appropriate, drug counseling be incorporated into Medoff's release conditions. The court also ordered an immediate drug test to set a baseline. The test indicated Medoff's use of marijuana and cocaine. Afterwards, Medoff admitted to having consumed marijuana edibles that morning. The court did not revoke Medoff's pretrial release, but it warned him that he faced a substantial risk of revocation if he were to test positive again.

Finally, the district court concluded the April 29, 2024, pretrial conference by questioning whether it had been appropriate to appoint CJA counsel for Medoff. The court expressed concern about Medoff's representation of indigency and failure to make any fine or disgorgement payments given that he was the beneficiary of a trust holding more than $900,000 for his benefit and had received more than $1.6 million for conduct that violated the 2016 consent judgment.

On May 14, 2024, the probation department filed a petition to issue a summons for Medoff to appear because he had tested positive for cocaine use on three additional occasions following his initial positive test. The following day, Medoff filed a motion to enter a guilty plea, without any agreement with the government. See Fed. R. Crim. P. 11(a)(1). On May 16, 2024, the district court convened a hearing to address these filings. At the hearing, Medoff admitted that he had violated the 2016 consent judgment and pleaded guilty to the charge of criminal contempt. The court accepted Medoff's plea and scheduled sentencing for August 7, 2024. The court also again raised questions about the accuracy and completeness of the financial statement that Medoff had filed in support of his request for CJA counsel and placed a gag order on Medoff to preclude him from communicating with one Mark Levy, a person to whom Medoff allegedly owed money and who the court suspected of hiding assets for Medoff.

In addition, the district court continued Medoff's release on conditions prior to sentencing. The court said it was a close question whether to order that Medoff be taken into custody and stated that it was not sure whether it was correct to find by clear and convincing evidence, as it did, that Medoff was unlikely to flee or to pose a danger to the safety of any other person.[6] The court did, however, impose several additional conditions on Medoff's release. In any event, on May 31, 2024, after additional drug tests showed continued cocaine use, and after Medoff sent the probation department an email making clear that he had been dishonest about his drug use, the department again petitioned the court to issue a summons for Medoff to appear. On June 3, 2024, following a hearing on the petition, the court revoked Medoff's supervised release.

On August 5, 2024, after reading the presentence report ("PSR") prepared by the probation department for Medoff's sentencing, the district court issued a memorandum and order directing the parties to be prepared to discuss at sentencing several issues bearing on whether it should impose a variant sentence above the applicable GSR, which the PSR set at four to ten months in prison. In particular, the court intended to explore

---

[6] The record contains evidence of unscored criminal conduct involving violent and threatening behavior by Medoff over the years.

whether Medoff should be entitled to a two-level reduction for acceptance of responsibility (as the PSR recommended with the joint agreement of the parties), notwithstanding that he had repeatedly lied to the court and the probation department about his drug use; whether Medoff's criminal history category of II substantially understated the seriousness of his criminal history and the likelihood that he would commit future crimes; and whether it should attach significance to the fact that, although Medoff was not shown to have caused any victim to suffer a loss, he had nonetheless received approximately $1.675 million for violating the 2016 consent judgment and had never paid the fine or disgorgement ordered in that judgment. The court indicated that it was considering an upward variant sentence of thirty months.

On August 7, 2024, the district court conducted Medoff's sentencing hearing. Despite its previous reservations, the court agreed to award Medoff a two-level reduction for acceptance of responsibility, citing his cooperation with the SEC after it filed its motion to show cause and stating that it would instead consider Medoff's lying in the context of deciding whether to impose an upward variance. This led the court to agree with the PSR that Medoff's total offense level was eight; his criminal history category was II; his GSR was four to ten months in prison followed by twenty-four to sixty months of supervised release; and his fine

range was $2,000 to $20,000 (with a maximum of $250,000) plus a $100 special assessment.

The district court then invited counsel to speak. Counsel for the SEC took no position on what sentence should be imposed but stated that the injunctive relief that Medoff flouted "is one of the tools that the SEC uses to achieve its aim of protecting investors." Government counsel recommended a sentence of ten months -- the high end of the GSR. In doing so, government counsel expressed agreement with the court that civil contempt would have been an insufficient remedy. Government counsel also explained that, because this was not a case that the government investigated or charged, the government's understanding of the facts evolved considerably as the case proceeded. As a result, and as the government learned more about Medoff's behavior and history, its sentencing recommendations grew more severe. Government counsel did not express opposition to a variance above the GSR and agreed with the court's suggestion that the case involved aggravating factors not accounted for by the GSR.

Medoff's counsel argued for a time-served sentence, which would have amounted to about three months in prison. Medoff's counsel emphasized that his conduct had not caused anyone harm and was fueled by a now-controlled drug addiction. Medoff's counsel also contended that Medoff's violation of the 2016 consent

judgment was not in and of itself dangerous to any purchaser of securities.

Ultimately, the district court imposed an upward variance and sentenced Medoff to twenty months in prison and thirty-six months of supervised release. The court also imposed a $20,000 fine, to be paid starting immediately, and a $100 special assessment.

In imposing this sentence, the district court stated that it had considered a sentence of thirty months but decided that twenty months was sufficient and not more than necessary to serve the purposes of sentencing. See 18 U.S.C. § 3553(a) (setting forth the factors to be considered in imposing a sentence). The court observed that, even after crediting Medoff's cooperation with the SEC as a mitigating factor, an upward variance was warranted because a criminal history category of II substantially underrepresented both the seriousness of Medoff's criminal history -- which included a considerable amount of uncharged and unscored criminal conduct -- and the likelihood that he would commit future crimes. The court also explicitly discussed each of the section 3553(a) sentencing criteria to explain how they required the court to account for several aggravating factors that militated in favor of an above-guidelines sentence. Medoff raised no objections to the court's sentencing analysis when afforded an opportunity to do so.

As we noted at the outset, Medoff presents two arguments on appeal. Primarily, he contends that the district court erred in denying his motion to recuse. Alternatively, he asserts that his sentence should be vacated because it was both procedurally and substantively unreasonable. We begin with recusal.

**A.**

Medoff's challenge to the district court's denial of his motion to recuse proceeds along two lines. The first contests the lawfulness of the district court's decision to initiate a criminal proceeding on its own rather than referring the case to the U.S. Attorney's Office for evaluation and, if appropriate, indictment by a grand jury. The second focuses on the court's rulings and comments following the SEC's filing of its motion to show cause in the civil case and argues that, when viewed collectively by a reasonable observer, the observer would conclude that the court's actions gave rise to an appearance of "partiality" requiring recusal under section 455(a).

Medoff has waived his first argument for recusal. As previously noted, Medoff never suggested below that the district court lacked the authority to initiate a criminal contempt proceeding absent a prior referral to the U.S. Attorney's Office for evaluation and, if appropriate, a grand jury indictment. Nor does Medoff argue on appeal that the court plainly erred in

proceeding as it did. We therefore decline to take up Medoff's first line of argument and confine our analysis to Medoff's argument that the court's rulings and comments required recusal under section 455(a) because of an appearance of partiality. See, e.g., United States v. Feleciano-Candelario, 128 F.4th 5, 16 (1st Cir. 2025) (failure to argue that an unpreserved issue involved plain error waives any claim for relief based on that issue).[7]

The showing that Medoff must make to prevail on this argument is formidable. Again, section 455(a) requires that a judge "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Therefore, a judge

---

[7] Two members of the United States Supreme Court have suggested, in the related but not identical context where a trial court appointed prosecutors under Rule 42(a)(2) after the government declined its request to prosecute, that a trial court's decision to prosecute anyway, without executive branch approval, may raise separation of powers concerns and violate a defendant's due process rights. See Donziger v. United States, 143 S. Ct. 868, 869-70 (2023) (Gorsuch, J., joined by Kavanaugh, J., dissenting from the denial of a writ of certiorari) ("By interpreting Rule 42 as authorizing courts to make their own decision to initiate a prosecution -- and even to override a contrary decision by the Executive Branch -- the [decision below] not only arrogated a power to the Judiciary that belongs elsewhere. It allowed the district court to assume the 'dual position as accuser and decisionmaker' -- a combination that violates the due process rights of the accused." (quoting Williams v. Pennsylvania, 579 U.S. 1, 9 (2016))); see also Young v. United States ex. rel. Vuitton et Fils, S.A., 481 U.S. 787, 815-25 (1987) (Scalia, J., concurring in the judgment) (arguing in a case involving court-appointed, private prosecutors that the Article III judicial power does not permit federal judges to seek out violators of court orders in order to punish them). For the reasons stated, we do not engage this complex and unsettled issue.

- 34 -

considering a motion to recuse must ask whether "the facts asserted 'provide what an objective, knowledgeable member of the public would find to be a reasonable basis for doubting the judge's impartiality.'"  In re Boston's Children First, 244 F.3d 164, 167 (1st Cir. 2001 (quoting In re United States, 666 F.2d 690, 695 (1st Cir. 1981)).  It is true, as Medoff notes, that "doubts ordinarily ought to be resolved in favor of recusal."  In re United States, 441 F.3d 44, 56 (1st Cir. 2006) (quoting In re United States, 158 F.3d 26, 30 (1st Cir. 1998)).  But the Supreme Court has provided guidance, which we summarize immediately below, on what does and does not give rise to objectively reasonable doubts about a judge's partiality.  Medoff's brief does not mention, let alone endeavor to apply, this guidance.

As a threshold matter, as the Supreme Court explained in Liteky, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion."  510 U.S. at 555.  "Almost invariably, [such rulings] are proper grounds for appeal, not for recusal."  Id.  Moreover, a judge's opinions that are, as here, premised on "facts introduced or events occurring in the course of the current proceedings, or of prior proceedings," and not on a source outside of judicial proceedings (known as an "extrajudicial source"), "do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."  Id.; see id. at 558

- 35 -

(Kennedy, J., concurring in the judgment) ("[U]nder [section] 455(a), a judge should be disqualified only if it appears that he or she harbors an aversion, hostility[,] or disposition of a kind that a fair-minded person could not set aside when judging the dispute."); see also Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 889 (2009) (quoting Liteky, 510 U.S. at 558 (Kennedy, J., concurring in the judgment)). Consequently, judicial remarks "that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a [section 455(a)] bias or partiality challenge." Liteky, 510 U.S. at 555.[8]

---

[8] In Liteky, the Supreme Court provided the following extensive explanation for the demanding showing one must make to establish a judge's partiality. We quote in its entirety because of its relevance to our evaluation of Medoff's recusal argument:

> Not all unfavorable disposition towards an individual (or his case) is properly described by [the words "bias" or "prejudice," which constitute the elements of section 455(a) partiality, see id. at 552]. One would not say, for example, that world opinion is biased or prejudiced against Adolf Hitler. The words connote a favorable or unfavorable disposition or opinion that is somehow wrongful or inappropriate, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess (for example, a criminal juror who has been biased or prejudiced by receipt of inadmissible evidence concerning the defendant's prior criminal activities), or because it is excessive in degree (for example, a criminal juror who is so inflamed by properly admitted evidence of a defendant's prior criminal activities

- 36 -

Moreover, whether a judge's impartiality might reasonably be questioned is a determination ultimately committed to the discretion of the district court.  In re United States, 666 F.2d at 695.  Given that reasonable minds may differ on this matter, we review a court's decision not to recuse under the highly deferential abuse-of-discretion standard.  See United States v. Torres-Estrada, 817 F.3d 376, 380 (1st Cir. 2016).  In applying

that he will vote guilty regardless of the facts). . . .

The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person.  But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task.  As Judge Jerome Frank pithily put it: "Impartiality is not gullibility.  Disinterestedness does not mean child-like innocence.  If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." Also not subject to deprecatory characterization as "bias" or "prejudice" are opinions held by judges as a result of what they learned in earlier proceedings.  It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant. . . .

"Partiality" [within the meaning of section 455(a)] does not refer to all favoritism, but only to such as is, for some reason, wrongful or inappropriate.

Liteky, 510 U.S. at 550-52 (explaining why a finding of partiality ordinarily must be premised on an "extrajudicial source") (citation omitted) (emphasis in original).

this standard, we "will sustain the district court's ruling unless we find that it cannot be defended as a rational conclusion supported by a reasonable reading of the record." Id. (alteration omitted) (quoting United States v. Pulido, 566 F.3d 52, 62 (1st Cir.2009)).[9]

When evaluated against the substantive law and our standard of review, Medoff's argument for recusal is unconvincing. Medoff advances nine reasons why the district court abused its discretion in denying his recusal motion. Medoff says, first, that the district court exhibited partiality by initiating a criminal contempt proceeding even though the government had not done so and even though the SEC took the position that such a proceeding was unnecessary. But any suggestion that the government's failure to initiate a criminal contempt proceeding reflected disagreement with the court about the propriety of such a proceeding is belied by its acceptance, without objection, of

---

[9] We have at times described the applicable appellate standard of review as asking whether an "objective, reasonable member of the public, 'fully informed of all the relevant facts,' would fairly question the trial judge's impartiality." In re United States, 441 F.3d at 56-57 (quoting In re United States, 158 F.3d at 31). This formulation should not be understood to require reversal if a single, objectively reasonable person could fairly question a judge's impartiality. Rather, consistent with how abuse-of-discretion review operates, the denial of a recusal motion will be upheld if, as we have just stated, reasonable minds may differ about the judge's ruling.

the court's appointment to prosecute Medoff, and its subsequent prosecution of him. Cf. Fed. R. Crim. P. 42(a)(2) (expressly contemplating government denial of a court's request to prosecute a criminal contempt).[10]

Moreover, Medoff misreads the record in twice suggesting that the SEC opined that a criminal contempt proceeding was unnecessary. As we have noted, the SEC counsel disclaimed any authority to initiate a criminal contempt proceeding. SEC counsel also clarified that, in stating that further sanctions were unnecessary in the November 23, 2023, joint status report, the agency intended only to say that it regarded further civil sanctions as unnecessary. The agency never expressed a view on the district court's conclusion that a criminal contempt proceeding was appropriate.

Medoff next contends that the district court's status as "the party aggrieved" by Medoff's violation of its 2016 consent

---

[10] In his reply brief, Medoff states that the government "express[ed] the view that criminal contempt was not warranted." Medoff also states that the district court "dismiss[ed] the government's view of recusal," implying that the government tacitly agreed with him that recusal was appropriate. Neither statement is supported by the record. As to the former statement, the record contains no "express" indication from the government that a criminal contempt prosecution was unwarranted. Indeed, as we have just noted, the government's acceptance of the court's appointment and subsequent prosecution of the case would seem, if anything, to reflect a contrary view. As to the latter statement, we have no basis to disregard the government's statement that it had no position on Medoff's motion. There was thus no "government view" of the recusal issue for the district court to dismiss.

- 39 -

judgment rendered it insufficiently detached to maintain impartiality. In support of the argument, Medoff points to the court's repeated statements that it does not issue orders that it does not intend to enforce; its description of Medoff's recusal motion as "frivolous"; its chastisement of the government for not opposing Medoff's motion; and its related concern that the government would not properly prosecute the case.

We note preliminarily that the frustration expressed in these statements was directed at counsel for their conduct in the civil and criminal cases, and not at Medoff himself. Moreover, as we have noted, Medoff does not argue, let alone demonstrate, that there is reason for treating these statements as outside the rule that "remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." Liteky, 510 U.S. at 555; see also United States v. Caramadre, 807 F.3d 359, 374-75 (1st Cir. 2015) (concluding that judge's actions "did not cross the Liteky line" though judge, inter alia, characterized party's motion as "entirely meritless, bordering on frivolous" and "an incredibly cynical and disturbing effort to manipulate the court and the criminal justice system").

Medoff's third ground supporting recusal highlights the speed with which the district court sought to hold the criminal contempt trial and the court's repeated expressions of concern

that Medoff's counsel was attempting to unduly delay it. Medoff notes that the court set a trial date fewer than forty-five days from the date on which it instituted the criminal proceeding and states: "When defense counsel objected and requested a continuance -- with the government's assent -- the district court denied the request." This argument again misstates the record. As we have explained, on February 29, 2024, the court granted newly appointed Attorney Horstmann's February 26, 2024, motion to continue the trial date. Subsequently, after setting trial for April 22, 2024, and initially denying Medoff's motion to continue trial further, the court continued the trial date twice more: to April 29, 2024, and then to May 20, 2024. Medoff's remedy for these case-management "judicial rulings" was "appeal, not . . . recusal." Liteky, 510 U.S. at 555.[11]

The remaining grounds that Medoff asserts in support of his motion for recusal stem from events and comments that post-dated the motion's filing and resolution. Medoff would have us infer partiality from the district court's rejections of the two proposed Rule 11(c)(1)(C) plea agreements; doubts the court expressed about Medoff's entitlement to credit for acceptance of

---

[11] To the extent that Medoff seeks to have us infer partiality from the district court's repeated assertions that counsel was attempting to unduly delay the trial, we note that counsel acknowledged to the court that Medoff's recusal motion was "maybe" motivated, at least in part, by a "righteous" desire for delay.

responsibility before awarding the credit and the adequacy of Medoff's criminal history score, given his unscored criminal history; concerns the court expressed about whether Medoff's punishment should be enhanced because of his dishonesty with the court and the probation department about his drug use; concerns the court expressed about Medoff's dangerousness, given his history of violating securities laws and court orders; and concerns the court expressed about whether Medoff was hiding assets to avoid paying prior fines and disgorgement orders and to secure court-appointed counsel.

Because these grounds post-dated the filing and disposition of Medoff's motion to recuse, they were, of course, not considered by the district court. Thus, they cannot themselves directly ground a ruling that the court abused its discretion in denying the motion. Yet even assuming their relevance to the court's state of mind during the criminal case, they do not affect our judgment. Medoff treats the wrongfulness of these actions and comments as largely self-evident. See Liteky, 510 U.S. at 552 (explaining that that a judge's predisposition towards a litigant must be "wrongful or inappropriate" to constitute partiality within the meaning of section 455(a)). But in our view, these actions and comments, whether they are considered individually or in combination, do not suggest a wrongful predisposition against Medoff, which (again) the Supreme Court has defined as a

"deep-seated . . . antagonism" on the part of the court "that would make fair judgment impossible." Liteky, 510 U.S. at 555.

The record, which we have described in detail, demonstrates that the district court regarded Medoff's extensive history of flouting judicial orders as requiring a serious and prompt response for which additional civil sanctions would be inadequate.  It also reveals a court troubled by a perceived tendency on the part of the SEC to enter into unenforceable settlement agreements and, consequently, committed to ensuring the enforceability of the orders it issued.  Neither view strikes us as wrongful, inappropriate, or partial.  Moreover, throughout the civil and criminal proceedings, the court advised Medoff of, and respected, his rights.  Indeed, much of the court's commentary offered transparency to the parties about the court's thinking, which provided useful information on how the parties might go about resolving the case.  In sum, this case does not involve the "rarest [of] circumstances" where a court shows "the degree of favoritism or antagonism required" for recusal under section 455(a) "when no extrajudicial source is involved." Liteky, 510 U.S. at 555.  We therefore conclude that the district court acted within its discretion in denying Medoff's motion to recuse.

**B.**

Medoff alternatively argues that the twenty-month upwardly variant sentence that the district court imposed was both

procedurally and substantively unreasonable.[12]  As to procedure,
Medoff contends that the court made two mistakes:  (1) the court
erred in concluding that an upwardly variant sentence was necessary
to deter Medoff from engaging in additional criminal conduct and
to protect the public from further crimes; and (2) the court erred
in "entirely dismissing" national sentencing statistics indicating
that three months was the average sentence for defendants sentenced
under the same guideline and GSR, and in the same criminal history
category, as Medoff.  As to substance, Medoff contends that his
twenty-month sentence was longer than necessary when viewed in the
light of various record data points.  The government defends the
lawfulness of the sentence, arguing that Medoff has waived his
procedural objections and that, in any event, the sentence was
procedurally and substantively reasonable.  Medoff denies waiver
of his procedural reasonableness arguments.

**1.**

We bypass the issue-preservation dispute because, even
assuming Medoff's procedural reasonableness arguments are properly
before us, they reveal no abuse of discretion. See United States
v. Waithe, 150 F.4th 16, 23 (1st Cir. 2025) (bypassing a dispute

---

[12]    Medoff  has  completed  the  custodial  portion  of  his
sentence.    His  sentencing  claim  nevertheless  remains  a  live
controversy  because,  if  successful,  he  could  seek  an  equitable
reduction  in  his  supervised-release  term.   See United States v.
Reyes-Barreto, 24 F.4th 82, 86 (1st Cir. 2022).

over whether a procedural reasonableness challenge was preserved where review of the issue, if preserved, would be for abuse of discretion and where there was no such abuse). Medoff's first procedural reasonableness argument is that his sentence cannot be justified under the rationales of deterring "criminal conduct," or protecting the public from "further crimes," 18 U.S.C. § 3553(a)(2)(B),(C), because his violation of the 2016 civil consent judgment was not itself "criminal conduct" and because he does not otherwise have a recent criminal conviction. Medoff's argument proceeds from a faulty premise. Violating the terms of an injunction in circumstances amounting to criminal contempt of that injunction is itself a crime -- one to which Medoff pleaded guilty. See 18 U.S.C. § 401(3). The court did not commit procedural error in treating the factors specified in sub-sections 3553(a)(2)(B), (C) as relevant to Medoff's sentence.

Medoff's second procedural reasonableness argument also proceeds from a faulty premise. The district court did not "entirely dismiss" the sentencing statistics to which Medoff refers. Rather, after acknowledging the statutory obligation to avoid unwarranted sentence disparities, id., § 3553(a)(6), and after explicitly recognizing that the average sentence for defendants with the same guidelines scores as Medoff was three months, the court stated:

- 45 -

> But every case is unique. I don't know anything about those cases [referenced in the statistics]. I don't know if they're criminal contempt cases, I don't know anything about the history and characteristics of the people, but I doubt that many, if any, have a combination of factors that make this an exceptional case, including decades of flagrantly violating court orders, in some instances federal security laws.

The court did not fail to consider the sentencing statistics; it justifiably disagreed with Medoff's view of their importance. Here too there was no abuse of discretion. See Waithe, 150 F.4th at 25.

### 2.

Medoff's substantive reasonableness argument is that his twenty-month sentence was longer than necessary and therefore an abuse of discretion. See id., 150 F.4th at 25 (reviewing for abuse of discretion a preserved challenge to the substantive reasonableness of a sentence). This argument is premised on two underlying assertions. The first is that the district court erroneously regarded him as a serial violator of federal securities laws when he had only a single, decades-old criminal conviction that was accounted for in his GSR and for which he was sentenced to only probation and a fine. The second is that his twenty-month sentence was incommensurate when evaluated in light of five different record data points: (1) the sentences proposed in the two Rule 11(c)(1)(C) plea deals (zero-to-three months and

four-to-ten months) that the court rejected; (2) the applicable GSR (four-to-ten months); (3) the government's recommended sentence (ten months); (4) the sentencing statistics showing the average sentence of defendants with Medoff's guidelines scores (three months); and (5) the time Medoff served for two probation violations in connection with the 1995 securities fraud conviction.[13]

Medoff's first underlying argument is without merit. Although the civil actions that the SEC brought against Medoff in 1993 and 2012 did not culminate in criminal convictions, they too involved admitted "violations" of federal securities laws as that term is commonly understood. The district court therefore did not err in regarding them as such. Moreover, we have reviewed the record with care and see no evidence that the court was unaware either that the 1995 criminal conviction was accounted for by the GSR or that Medoff's prior incarcerations were not, at least directly, for violations of federal securities laws.

In emphasizing the five data points on which his second underlying argument rests, Medoff does little to engage the district court's discussion of the section 3553(a) criteria and why they, in its view, revealed several aggravating factors not

---

[13] Medoff alleges that he served a total of twelve months for these probation violations, and the court appears to have proceeded on the same assumption. The PSR indicates, however, that Medoff served just over seventeen months.

accounted for in the GSR and necessitating an upward variance. These factors included that Medoff had been flouting court orders "going back to the 1990s [that] restrict[ed] [his] participation in the securities industry"; that Medoff was convicted on two counts of security fraud in 1995, then served significant time for probation violations related to these convictions, but that his time in prison did not deter him from violating the 2016 consent judgment; that Medoff had received approximately $1,675,000 for conduct violative of the 2016 consent judgment, but that these monies obtained from criminal conduct were not accounted for in calculating his GSR; that Medoff began violating the 2016 consent judgment almost immediately after it was entered; that Medoff's criminal contempt of the 2016 consent judgment involved seven years of criminal conduct; that Medoff used a false identity to conceal this criminal conduct; that Medoff repeatedly violated the conditions of his pretrial release in the criminal case by using drugs and then lying to the court and probation office about having done so; that Medoff and others like him need to be deterred from violating court orders; and that Medoff was a danger to the public, given his persistent involvement in securities work notwithstanding multiple court orders barring him from doing so.

"Where, as here, the [sentencing] court imposes an upwardly variant sentence, it must explain its reasons for doing so." Waithe, 150 F.4th at 25 (quoting United States v.

Flores-Nater, 62 F.4th 652, 655 (1st Cir. 2023)). Moreover, "[t]he court's burden of explanation 'increases in proportion to the extent of [its] deviation from the [GSR].'" Id. (quoting United States v. Montero-Montero, 817 F.3d 35, 37 (1st Cir. 2016)). But there is no single correct sentence in any case; rather, there is "a universe of reasonable sentencing outcomes." United States v. Clogston, 662 F.3d 588, 592 (1st Cir. 2011). And a sentence falls within that universe if the sentencing court provides a "plausible sentencing rationale and a defensible result." Flores-Nater, 62 F.4th at 655 (quoting United States v. Díaz-Lugo, 963 F.3d 145, 157 (1st Cir. 2020)).

Here, the district court's thorough explanation of the aggravating factors that led it to impose an upwardly variant twenty-month sentence was quite plausible and more than sufficed to establish the sentence's defensibility. We therefore reject Medoff's argument that his sentence was substantively unreasonable. In so ruling, we reiterate that, although the government recommended a sentence of ten months, it ultimately agreed with the court that there were aggravating factors not accounted for by the GSR and expressed no opposition to the upwardly variant sentence that the court imposed.

## III.

For the reasons stated, we **affirm** defendant-appellant Craig Medoff's sentence.